Good morning, your honors, and may it please the court. This is an appeal of a class certification decision that certified a class of all purchasers, which is apparently more than 11 million purchasers of a rigid wet-dry vacuum manufactured by my client, Emerson Electric. We believe that the class certification ruling should be reversed, and that it should be reversed for primarily three reasons. The first is that under this court's ruling in the Paris case by Judge Kelly, a nationwide class action cannot be certified under the Missouri Merchandising Practices Act, where the purchasers bought this product outside of the state of Missouri. Secondly, under the first St. Jude case decided by this court, the plaintiffs cannot show what common questions predominate because of the fact that there needs to be a choice of law analysis even for the other counts that exist. In addition, Judge Colleton's second St. Jude case demonstrates that there is not common questions of fact or law that predominate in this case. One sentence in the trial court's order that's on appeal I think really drives home the issues with this class.  And what the court wrote there was, if, quote, certain purchasers did purchase the wet-dry vac for reasons other than the advertised P course power, those purchasers will likely not file a claim, apparently in the claims resolution process. And so we believe that that sentence is an acknowledgement that there are many class members, and the expert testimony establishes that there could be as many as 3 million customers without harm or damage in this case, but that the individual questions of causation and of damage are going to be resolved under the district court's approach through a claims resolution process, which we don't think is appropriate. And so for those reasons, we believe that this class, remarkably broad, unrestricted by geography, unrestricted by time, unrestricted to people who even read the allegedly false or misleading advertising, and unrestricted to any requirement of proof of damage other than a hope that the people who weren't harmed or who did not read the material might not submit a claim. Is it possible to be harmed by representation you're unaware of? I don't believe so, certainly in this case. I mean, there are stock drop cases in the securities field where they do say that you can have a theory of a fraud on the market where there's an efficient market. We definitely cite several cases that reject that in the class action context for consumer products, including the McLaughlin case out of the Second Circuit. And then one of the fundamental points of the Paris case that Judge Kelly wrote was that when you look at these consumer cases, you have to have causation and harm. The MMPA, Missouri Merchandise Practicing Act, requires for there to be an action that you have an ascertainable loss resulting from the misrepresentation. And so if you have a situation here where a consumer never saw it, they weren't harmed by it, and it didn't cause their purchase, all of those are essential elements of the claims that are being made. And when you look at St. Jude 1, this is the case out of Minnesota where the trial court certified a class regarding a heart valve device under the Consumer Fraud Act. What the Eighth Circuit held in that case was that you couldn't have a class certified there because, in the words of the court, some patients didn't get any representation about the heart valve at issue. In addition, some heard about it from doctors and not from the marketing material, and then some heard different representations that were made. And if you look at the St. Jude case, which I would say is the one that's most on point for Your Honor's question, from this court at least, you would say that in the absence of all the class members seeing all of the same representations, you can't have a class action like that. But in this case, wouldn't the representations be all the same, even if there are persons who didn't receive those representations, there's not a dispute about what the misrepresentation is alleged to be? Yes, there is, Your Honor. And I don't even think it's a disputed one because the record evidence in this case is very clear that, starting in 2008 and 2009, but certainly by 2010, our packaging contained material. And this is the new disclosure is at Appendix 3314. But we started putting it on our box nine years ago. Nine years of class members received an additional disclosure that says, quote, peak horsepower represents a level at or below the maximum horsepower output of an electric motor tested in a laboratory using a dynamometer. And so we have a disclosure that says it's a lab-based item, and we have record evidence that that happened by 2010. That's in our 30B-6 testimony at Appendix 468-69. This is talked about in all the expert reports. And so we do have the classic case. We have all of the circumstances that courts have used to reject certification. We have a large number of people who didn't read it, the representation at issue. We have different messages, even from us, because nine years ago, we changed the disclosure. And then we have direct evidence, strong evidence, from the class members themselves that they either didn't read the materials at issue or that they didn't rely on it at all. I mean, we have direct testimony from, for example, Class Representative Brees at Appendix 3167, where he's asked, did you look at the box? And his answer is no. So you wouldn't have taken the box down and looked at any of the language on it at all? The answer is no. So any information that would have come on the box played no role in influencing your purchase decision? Yes. That's Appendix 3167. But then we go on to talk to the others in their depositions, where they say, for example, they bought based on prior experience. They bought based on applications that don't need high horsepower. In fact, if you look at Mr. Christopher Willis' deposition, this, to me, crystallizes all of these predominance issues. Mr. Willis is a class representative, and he said he bought based on prior experience. But he went so far as to say that prior experience, quote, is the reason he bought it. And that's at Appendix 3189. And so we have all of the touchstones of classes that simply cannot be certified, even on a single state basis, per St. Jude 2, where the court held that where patients didn't get the same representations, some didn't get them at all. Some received them from doctors, just like our products are sold at Home Depot. We don't have privity with the customers. We don't sell direct to the customers. And many of them talk to sales representatives. And so, Your Honor, to answer your question, which is the second question presented in the appeal, the first being, can you possibly have a nationwide class here? I believe that the record evidence, and it's undisputed because it comes from their own mouths of the testimony of the plaintiffs and the undisputed record, is that all of the circumstances that show that this case would be swamped with individual questions would predominate. Are you familiar with the Shopvac case from Pennsylvania? Yeah, the Shopvac case being the one that ended up getting settled and they did a new disclosure. They attached the settlement of that case there. And there, I think, if you, we don't think that that's, that certifying a class here for liability purposes, this isn't a settlement class action at all. It's a liability case. And I believe that even if you looked at the fundamental issue of whether peak horsepower is somehow that standing alone is deceptive, we would have to have individual trials on that as well. But the causation and the damages questions for individual plaintiffs in a liability and damages trial would overwhelm the case. Shopvac did result in a settlement class action, and it did result in the court approving a class action. But we view the circumstances here as being quite different, and in fact, the experts rely on the Shopvac experience to support the idea that there was no harm here. Let's take the very first fundamental point. So I guess in that case, there were no challenges to choice of law and predominance? I believe Shopvac would be, was the materials that are in the appendix, which are attached to the plaintiff's motion for class certification, relates to a settlement class action where they paid $4 million to change the labeling, but no damages. And that was what was presented there. And I don't believe that there is any holding in that case that would say that where you have evidence like we have here, where consumers aren't relying on it, and where there are no damages, that you could have a liability challenge case presented. Shopvac did result in a change in labeling for one of our competitors, but it resulted in no change in price and no sales information. Fundamentally when you look at choice of law, here we have an MMPA claim, Missouri Merchandise Practicing Act claim, and Paris from Judge Kelly is directly on point. Like Emerson, Home Depot, I mean, like Emerson, H&R Block was a Missouri-based company that planned what plaintiffs contended was a nationwide deceptive practice out of their Kansas City headquarters, but the court declined to apply Missouri law nationwide because as the court, this court held, quote, the law applicable to each class member would be the consumer protection statute of that member's state. I don't think that there's any basis to distinguish Paris. The trial court relied on a case called Estes. Estes is extremely different than this case because Estes was a Missouri Attorney General action and it was in state court. It doesn't present any of the Article III standing requirements. It doesn't present any need to prove damages. The Attorney General wasn't even seeking damages in that case. No federal case has cited Estes, which the trial court relied on here for certifying a nationwide class action, and of course in that case, there's many factual differences as well, which is that the defendant made calls from Missouri to consumers, the defendant received money from consumers in Missouri, and the contracts at issue, they were vending machine contracts, were actually signed in Missouri. Here our products are made elsewhere, shipped elsewhere, and we sell them to Home Depot and then Home Depot sells them to the consumer. And so as this court held in Paris, that should be a law of the state where the transaction took place. Mr. Bennett, I know in Paris we looked at the MMPA and addressed that. Do you think the case can be resolved on standard choice of law issues under Missouri law or is it your view that we have to get to the MMPA specifically as we did in Paris? I don't think, I think you can resolve it under standard choice of law analysis as well, which is essentially what the court directed the district court to do in St. Jude 1. And that's a perfectly appropriate way to do that. You wouldn't have to reach an interpretation, I suppose, of state law. But under all of the restatement standards, the headquarters or the gravamen of the action is the law of the state where it happened. We do cite and talk about restatement factors for each one of the three causes of action. And needless to say, St. Jude also tells the district court that for every single claim you have to do this choice of law analysis. And that would be reversible error for just simply not doing it at all for the warranty and the unjust enrichment claims as well. When you look at choice of law, Your Honor, you're looking at, you know, I would say we have a hierarchy of arguments, all of which count, move towards reversal, which would be Paris says it doesn't apply extraterritorially, St. Jude says you can't apply these nationwide. And so in all of those circumstances, we think it would be grounds for reversal of all of the causes of action. Then if you get to the question, could you certify a statewide case under Missouri law? What would you have there? You could not do that as well for the reasons, two fundamental reasons. One is causation is an element of every claim. And St. Jude and Hardy Plank, which is a great district of Minnesota case that applies to this court's precedent, says that where you have all of these circumstances we have here, you have individual issues of causation. But equally fundamental, and perhaps even more fundamentally, we have a situation here where the plaintiff's own expert who came up with a $345 to $407 million damage model based on a survey, when you look in that survey, even the plaintiff's own respondents to its survey shows that 30% of the customer base would not pay anything different. And therefore, we're not harmed. And so we have a situation where there are literally millions of people, if you even accept the plaintiff's damages theory, who weren't harmed at all in this situation. And we cite a series of cases, and from this court you would say the Blades versus Monsanto case, where the court says damages to all class members must be shown to justify the class action. And they have to be able to prove, quote, the fact of injury for the class as a whole with common evidence. And the court in Blades declined to certify this court in Blades where not every member of the proposed class could prove with common evidence damage. I would urge the court, if you look at our briefing, to focus in on Comcast, the Supreme Court case, Blades from this case, McLaughlin from American Tobacco, which I believe addresses Judge Smith's question about can you have injury without someone actually reading something or being deceived by something. That's a light cigarette case where some large group of consumers actually said they would continue to buy the cigarette anyway. And they held that you can't do class-wide damage there. Our 28J letter, we just cited a case from the First Circuit, which is a really applicable case here, I would say, because it's an antitrust case where they found that 10% of the people so much less than ours, weren't harmed at all. And they went through and said that you can't under, as a call, you cannot have a class under those circumstances because you're not subjecting the defendant to fair procedures for class-wide proof of damages. As a call cites Judge Smith's decision and Halverson as well as support for that proposition. I'm eating into my rebuttal time at this point in time. I would just urge the court to reverse on both the nationwide class action aspect of this, but also the predominance because the main factors that St. Jude said need to be present for nationwide class action aren't present. We don't have a uniform representation. We don't have uniformity in reading it. We don't have uniformity in seeing it. We don't have uniformity in whether the plaintiffs actually relied on that fact. Thank you, Your Honor. Mr. Simon. Thank you, Your Honors. May it please the court. I want to address a few of the points that he just made just so I can get to them. First, in this case, this is a very typical consumer class action case. This isn't an antitrust case where injury, in fact, is an element of the cause of action. That's all the cases he cited were either antitrust cases with respect to that issue. This is the test for a class-wide proceeding is are there common answers apt to drive resolution of litigation? That's the Walmart case from the Supreme Court. Emerson had a nationwide campaign. For 10 years, they did studies and said, what's the most important thing to consumers when they're buying these types of vacuums? Their own study said the number one thing is horsepower. What they did, our contention is, they came up with a fake definition called peak horsepower, which sounds like horsepower, but it's not really. It can't be replicated at all when the consumer's using it. Doesn't it serve a reasonable function of offering the consumer a way to compare since others in the industry are using the same terminology? No, Your Honor, and here's why. Because what they've done is they've created, I won't say fake, but they've created a correlation between air watts, which is how much suction the hose has, and this peak horsepower definition they came up with. That's what they claim, but they didn't say, this has so many air watts, this has so many air watts, this has so the consumer can compare. If they really want to have the consumer compare air watts, they should have so stated. They didn't because they know consumers look at horsepower, and that's really what they want to look at is horsepower. They came up with this definition, our contention, and we proved it by an electrical engineer and their own testing and their own admissions of their engineer said it's not, the horsepower advertised is not what is real horsepower. It's something different. If we're right on that, and that's a false statement, what we've done is we've presented expert testimony that says under the MMPA, that was an unlawful act, and what is the ascertainable damage? Every person that bought one of those vacuums, according to our expert, Dr. Boddicker, using a methodology they haven't challenged, and his qualifications are not challenged. Even if they purchased it without consideration of what its peak horsepower potential was? Absolutely, and here's why. What Dr. Boddicker found was he did two conjoint studies and said, how do consumers rank these individual features, and what he found was 20%. It's very conceivable someone would purchase one for reasons completely devoid of the representation of its horsepower potential. That's absolutely correct, Your Honor, and here's the answer. They paid too much because the price was driven up by demand because they lied about horsepower, which caused the price to go up. So everybody, whether they looked at horsepower or not, suffered an ascertainable loss under the MMPA because the price they paid was too much, and that's our expert. Their expert didn't dispute that. He critiqued our survey. They didn't do their own survey. And he didn't find that 20% or 30% of the people don't care about horsepower. What he found was it's not in their top two or three points, and Dr. Boddicker, he gives an example, and this is in the appendix and I want to find it. He gives an example of you buy a package for cable television. It's at App, the appendix page is 4349 through 4350, and what he said is, my wife really loves ESPN. She likes to watch ESPN. I like the travel channel. The cable company decided, we're going to charge you 30 bucks for this package, which includes 10 channels plus those two. Now, individually, I might not pay $30 for ESPN. My wife would. She might pay more. But as a whole, that's the value of the package. Now, if ESPN is out for a month, I didn't get the value of what I paid for. I paid for that, and that price was set based on that package of factors, and that's what his study shows. So am I damaged even though I don't like ESPN? Sure I am, because I paid for a package that I didn't get. That's exactly what happened here. These consumers went in, and Emerson knew it, and they said, oh, which one has the most horsepower? Oh, that says peak horsepower 6 1⁄2, I'm going to buy that. When in reality, it's not a 6 1⁄2 horsepower motor. It's a made-up definition, and counsel talked about, well, we fixed it. Well, you know how they fixed it? They said maximum horsepower is something measured in a lab using a dynamometer. They didn't do what ShopVac was required to do, which is say, hey, this definition of horsepower we're using isn't a real definition of horsepower. It's a made-up definition we came up with, and by the way, we think it somehow correlates to air watts, which is what we think is the suction of the vacuum. So that's why even under the MMPA, even if some of the consumers didn't look at the ad, they still have an ascertainable loss. Now I'd like to talk first about conflicts of law, and Judge Kobus, you asked that question about whether or not that could be decided. You know, I heard counsel say the most important factor is where the injury occurred. That's not the most important factor under conflicts of law in Missouri. It's the relationship of the parties, and the relationship of the parties here, unlike the Paris decision, in Paris, H&R Block, a Missouri company, had representatives in other contracts with individuals from other states to do their taxes. So there was an individualized relationship where you went in and said, I want to get my taxes done in Kansas, and you met with an H&R Block representative in Kansas, and Judge Kelly, who wrote the Paris decision, said, yeah, that's an individualized contractual decision. That's the relationship occurred outside the state. Here Emerson didn't have people outside the state of Missouri talking to these people, and we're not accusing. He talked about, well, are the representations all the same? There's no question they're the same. The representations we're talking about are the same. We're not saying some Home Depot sales representative said something that was misrepresented. That's not the case. Emerson created these advertisements. Emerson sent the advertisements to Home Depot. Emerson did studies and said, here's how you're going to put our products in. You're going to use our packaging. You're going to use our point of purchase displays. Counsel talked about, well, one of our plaintiffs didn't look at the box. He did testify to that, but he also testified he saw other parts of the point of purchase displays in the advertising. I mean, there's no real evidence that nobody saw the advertisements at issue here. So would you say that in terms of our study in this case, it seems to me anyway to be a huge part of this to determine whether Paris or Estes, whether the facts of this case are closer to Paris or Estes, in which one of those holdings we should apply? We agree, Your Honor. And it's your view we should apply Estes? I think you should apply Estes. And the difference is exactly what I talked about here. Emerson created this ad in Missouri. They engineered the products in Missouri. They might be manufactured in China or somewhere else, but they engineered them, tested them. This peak horsepower testing that they came up with was all done in Missouri. They then packaged the product in a way that was required to be sold by Home Depot. They developed point of purchase material that was required to be used by the retailer. And the consumer came in and looked at that. So the relationship of the parties, if any, is here in Missouri because that's where the product emanated from. That's what Estes was about. The vending machines came from Missouri. They were sold outside to consumers outside the state of Missouri. And in Paris, that's not the situation. It's not a consumer product. It was an individualized transaction. And I made a few points that Judge Kelly made in Paris, which says specifically, Judge Kelly said each class member contracted with a local HR representative for tax services and paid the deceptive fee. This is an individualized encounter. There's evidence that each class member would offer would be specific to her experience in her state, at her local H&R Block office. The suit did not challenge the act of creating the fee. It challenged paying the fee. The payment of the fee happened outside the state. Here, all the conduct that we're challenging, and that's what the district court found as a faction matter, was in the state of Missouri. That was all found in the state of Missouri. Everything we're saying shouldn't have happened was in the state of Missouri. Testing, engineering, developing, marketing. That's what happened in Estes. In Estes, the Missouri Court of Appeals specifically held, yeah, you can apply the MMPA extraterritorially to people that were deceived by advertising created in Missouri by a Missouri entity outside the state of Missouri. And that's exactly what we have here. And that's what the district court found. I want to talk a little bit about the MMPA and the argument that there's a causation requirement, an individualized causation. St. Jude case. They heavily rely on the St. Jude case. St. Jude was a medical provider, a medical device manufacturer made heart valves. People go to their doctor because their heart valve is bad. And they say, I need a new heart valve, doc. What should I get? And the doctor says, oh, I think you should use this heart valve. And in that case, it's an individualized relationship where you're going to your doctor and saying, what heart valve should I use? And this court said, you know what, there's conflicting evidence of some doctors did get the representation, somebody didn't. This is a consumer product where you go into the store and buy it based on the purchasing. This is not a heart valve. Secondly, the entire St. Jude analysis was under the Minnesota Consumer Protection Act. I don't know the exact word for it. In that analysis, this court said the case, it was a Supreme Court case in Minnesota. I'm at a loss for the name, but I think it was General, but it's cited. And this court found that the Supreme Court of Minnesota said the Consumer Statute of Minnesota didn't eliminate reliance. It just relaxed the standard. And that's what this court held. Here, contrary to that, we have the Webster case, the Webster case, which makes it very clear in this court found in the Owens versus General Motors case, which we sat in our briefs. And what this court found was there is no requirement for reliance in Missouri. And there is no requirement to prove the elements of fraud under the MMPA, period. All that's required is an unlawful act and an ascertainable loss. And that's what we prove. If we're right and they misrepresented horsepower and people paid too much, whether they looked at it or didn't, that unlawful act creates an ascertainable loss. I want to quote from the Webster versus State Actual Webster case, which is another case that this court cited in the Owens case. And the Court of Appeals in Missouri, talking about the MMPA, where the argument was you have to have reliance or you have to have this causation, it said, because the MMPA says an unlawful act committed before, during, or after the sale, advertisement, or solicitation, quote, it's difficult to conceive how reliance can be an element of a cause of action which may be commenced before defendant has even begun advertising or solicitation. You can have a cause of action under the MMPA before anybody sees the advertisement, according to the Court of Appeals in Missouri. Here we have a situation where the very act of creating the ad was an unlawful act and we have secondary evidence, not just our experts that say, hey, consumers really care about horsepower and they purposefully create, according to our allegations, this made-up definition of horsepower to hoodwink consumers into paying too much than they should have. And our expert, whose qualifications aren't challenged, and who used accepted methodologies, now I agree they're expert critiques and said you should ask this question or that question, all of that goes to weight, not admissibility. All of that, he says, yeah, even though some consumers might not care so much about horsepower, they still had class-wide damages because they paid too much. I want to talk about three of the cases he mentioned. The Asicol case from the First Circuit that was submitted in a letter brief. In that case, that was an antitrust case that said company had a patent covering their product. Right before the patent expired, they withdrew the product on the market and under the FDA laws, a generic can't get on the market if the brand name is no longer on the market. And because there was no generic drug on the market, people couldn't buy the generic drug. And they said that's an antitrust violation and our class of people paid too much because had they been able to pay, buy a generic drug. The court found, and it was undisputed, about 10% of people buy the brand name drug anyway. They're not going to buy the generic even though it's less. That damage is an injury in fact. It was a standing issue, which hasn't been challenged here. That damage was an injury in fact and it's an element of the cause of action. And in that case, you have to say, well, I lost money because I would have bought the generic. And some people, it was undisputed, wouldn't have bought the generic. That's not the case here. If Asacol would have had a damage theory that said because there was no generic, the price was inflated and everybody paid too much, that would be a different story. That would be a little bit more like our case. The McLaughlin case, that was a RICO claim, a violation of the RICO statute for light cigarettes. And then the McLaughlin case, they said, well, because you deceived everybody by just generally the public knowing and thinking that light cigarettes means less, then people wouldn't have bought light cigarettes and so we want our money back. That again was an element where they said, well, some people probably would still buy cigarettes and by the way, there's a warning on cigarettes that says this is going to cause cancer and cause you to die and people bought it anyway. So some people probably, even if they knew that light cigarettes weren't healthier for them, would have probably still bought it. Again, injury in fact, element of the cause of action. The Halverson case that was mentioned in this particular, that this circuit decided, it was a breach of contract for not paying enough money for the reasonable charges incurred under MedPay contracts. And this court specifically found, well, sometimes people do pay more, get the reasonable amount reimbursed. Sometimes they didn't and it would require an individualized analysis. Again, none of those under the MMPA, not a single case they cite other than Paris, has any ruling based on the MMPA in this case. Our case is based on the MMPA. The judge applied the conflicts of law, Missouri law applied and the law in Missouri is clear that the MMPA, if you use deceptive advertising and sell to people outside the state, that can be, that's a cause of action that can be brought. Was the Webster case an MMPA case? Yes. The Webster case was MMPA and again, it was somebody who was selling services to people outside the state of Missouri and it was brought by the attorney general and said, you're defrauding people outside of the state of Missouri. And there were also people in the state of Missouri. But the key issue in the Webster case was the defendant argued, you have to show reliance or you have to show I intended to defraud people. And the court of appeals said, no, intent and reliance are not necessary elements of the cause of action. And that's the big distinction with St. Jude. This court rightfully decided, the Minnesota Supreme Court said, well, we're not saying reliance isn't required, we're saying it's a relaxed standard. That's not the Missouri law. The Missouri court of appeals and this court distinguished Estes in Paris and made the same finding. This court said in Paris, well, this is an individualized contractual transaction, unlike Estes where somebody is making false statements on products and selling them outside the state of Missouri. I would like to talk a little bit about now, about the causation and damages discussion. And with respect to the Comcast case, for our damages, we're not required to prove damages under Comcast. Under Comcast, there were five theories of antitrust liability. One was certified. The expert gave opinions that said this is a Supreme Court Comcast case that said, the expert said, here's the damages from all five theories. And the Supreme Court, even though it asked, please brief whether or not a district court has to decide whether or not an expert report is admissible, that was the question presented. They didn't decide the case on that because that was waived. But what the court found was, you have to identify damages stemming from defendant's conduct and it has to be susceptible to measurement across the entire class. That's exactly the proof we have in this case. We have damages, but we have damages paid too much, paid more than I should have because the price was inflated, because you misrepresented the horsepower, which consumers look at, and our expert measured, has said it's susceptible to measurement across the entire class. And there's critiques about our expert report, and it's not a final expert report. It's not required to be a final expert report. And this court, in the Zurn case, made it very clear. In the Zurn case, they were arguing the same thing Emerson made. You have to, the district court has to do a full Daubert analysis and determine the admissibility of the expert's opinions. And this court said, no, it doesn't. You don't have to, at the class certification stage, do the full analysis. With respect to, I think he had three points, I'm going to get to one more. Oh, there were some criticisms of the district court because the district court, they said, didn't do such a full analysis. At the conclusion of the district court's case, the district court, and this is at the addendum, I apologize. In the conclusion of the district court's case, the district court says, and this is an experienced district court judge who has denied class actions and some of the very reasons they've articulated here. The court has conducted a rigorous and painstaking analysis to ensure plaintiffs satisfied all Rule 23 requirements for certifying a class. The court has reviewed the materials submitted in favor and against class certification, which is all the Daubert briefing, and with an eye focused upon satisfying the concerns expressed by the Eighth Circuit. The court made it clear that it understood the requirements and what it had to do with a rigorous analysis under Rule 23 and that it had done so. Now they're trying to say, well, our expert would have come up with something else. We think that the decision was wrong. We didn't really lie. Horsepower, we have a formula for that and we fixed it. All those are fact questions and they'll get decided at the right time. This court made the decision and it used its discretion to determine, yes, I think Missouri law applies and nationwide class is appropriate and I think the case is more like Estes than Paris and therefore I'm going to rule in that favor. That's all I had, your honors, unless there were more questions. Thank you, Mr. Simon. Mr. Bennett, your rebuttal, and if you would, please address the appellee's characterizations of Estes and West. Certainly, your honor. One fundamental point on Estes. No case in the history of the federal courts has ever applied Estes to certify a national class action. It has never been cited for the proposition used here and there's a good reason for that. When Judge Kelly looked at Paris and distinguished Estes, what the Eighth Circuit focused in on was that lawsuits don't challenge the mere fact of creating the allegedly unlawful conduct. They have no standing to bring a claim for relief based solely on the advertising. The key is the purchase. So the reason, a reason, Estes has never, ever, ever, ever been cited or relied upon to certify a class action nationwide under the MMPA is that it's not a class action case at all. It's brought by the attorney general, it seeks an injunction and restitution. There's not even a claim for damages in Estes. And so it is legally extremely different than bringing a claim where you have to have standing and you have to have harm and you're seeking money damages in the form of a benefit of the bargain analysis in federal court to compare it to an attorney general action where no standing is required, where they're statutorily empowered to do these things and it's never been relied upon for that. And then you look at what the differences are. And there are major differences between this case and that case. The big three differences between the cases, your honors, are one, the defendant in Estes actually called directly to the customers and made miscommunications from Missouri. Here Emerson packages, these products are packaged elsewhere, they're made elsewhere, they're sent to Home Depot, they're sold to Home Depot. No person with Emerson talks to them from Missouri ever. In addition, the money from the consumer got sent to Missouri in Estes. And in that situation what that, the difference is here of course, the consumers don't pay Emerson anything. Emerson's already sold the product, it's sold to Home Depot. The money goes in the state. Does it matter that the allegation is that the misrepresentation originated in Missouri? They allege that it originated in Missouri, which is exactly what was alleged in Paris. In Paris what they alleged was the misrepresentation originated at H&R Block's headquarters in Kansas City. That's exactly parallel. And the key point being is what facts matter for Article III standing, what facts matter for federal court decision making? What fact really matters for a class action is exactly what this court said in Paris, which is the lawsuit can't challenge and doesn't challenge just the fact that something originates somewhere. What the court said there is the plaintiff, quote, would have no standing to bring a claim for relief against H&R Block solely for originating the scheme. And the key fact under Paris and the key fact under Estes is what do you have to have for a class action? And that is a sale. Nobody could sue us here and say, oh, well, I didn't buy the product somewhere but I want to challenge your practice. And that's the key dispositive fact. So I would suggest that Estes is distinguishable legally because of its posture and because no standing is required, because it's in state court, because it's not a class action, because they're not even seeking damages, and it's distinguishable legally because what the court held in Paris was most fundamental was the idea that you have to have a sale and the sale there was someplace else. If you remain in time, can you address Webster? Yes, certainly, Your Honor. Webster, and my one and two questions were the ones you brought up, so good. Webster is a case under the Missouri Merchandising Practices Act where they said that, strictly speaking, reliance in a fraud context is not a required element. But what they did not hold in that case and what they do not ever hold is that causation is not an element. And so what they said in the case is, and our court, your court, cites it in the Owen v. General Motors cases to say, you don't have to prove reliance, but, quote, there is no denying that causation is a necessary element. The plain language of the MMPA demands a causal connection between ascertainable loss and unfair or deceptive merchandise practicing act, and therefore, under the MMPA, consistent with Webster, consistent with this court's decision in Owen, 533 F. 3rd at 913, there is still a serious causation point. And what Judge Carlton gets into in the second St. Jude case is to say that when you've got those serious causation points, they present a lot of the same factual issues and factual differences. So I would urge the court to say, yes, reliance is technically not a requirement of the MMPA, but causation, in fact, is, and that causation presents individual issues of the same ilk that this court used to deny certification as well as the hardy plant case supplying it. I think I'm out of time, Your Honor, unless you have additional questions. I would just mention as well that we did challenge the full admissibility of all expert opinions. There was no analysis of it. Thank you. Thank you, Mr. Bennett. Thank you also, Mr. Simon. We thank both counsel for your presence before the court this morning, the argument which you provided to us, the briefing that you have submitted, and we'll take the case under advisement.